```
1                       UNITED STATES DISTRICT COURT
2                       EASTERN DISTRICT OF MICHIGAN
                              SOUTHERN DIVISION
3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5
     -v-                                  Case No. 19-mj-30614-2
6
     DWIGHT HASSAN RASHAD,
7
                         Defendant.
8    _____/

9                           DETENTION HEARING

10          BEFORE THE HONORABLE ELIZABETH A. STAFFORD
                    United States District Judge
11           Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
12                        Detroit, Michigan
                         November 25, 2019
13
     APPEARANCES:
14
     FOR THE PLAINTIFF:    Erin Shaw
15                         U.S. Attorney's Office
                           211 W. Fort Street
16                         Suite 2001
                           Detroit, MI 48226
17
     FOR THE DEFENDANT:    Todd Russell Perkins
18                         615 Griswold
                           Suite 400
19                         Detroit, MI 48226

20

21

22
     TRANSCRIBED BY:    Shacara V. Mapp, CSR-9305, RMR, FCRR, CRR
23                      www.transcriptorders.com

24
            (Transcriber not present at live proceedings.
25           Transcript produced from digital recording.)
```

1                         <u>TABLE OF CONTENTS</u>

2       <u>MATTER</u>                                                    <u>PAGE</u>

3       **DETENTION HEARING**

4       WITNESSES:

5       None

6       **Government's Proffer** Ms. Shaw:..........................   5
        **Defendant's Proffer** Mr Perkins:........................  13
7       **Government's Argument** Ms. Shaw:........................  19
        **Defendant's Argument** Mr. Perkins:......................  24

8
        EXHIBITS RECEIVED:
9
        None Offered
10

11

12      Certificate of Reporter..................................  34

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Detroit, Michigan

 2   November 25, 2019

 3   1:36 p.m.

 4                              *      *      *

 5            CASE MANAGER:  Calling Case Number 19-30614, United

 6   States of America versus Defendant Number Two, Dwight Hassan

 7   Rashad.

 8            MS. SHAW:  Good afternoon, again, Your Honor.  Erin

 9   Shaw for the United States.

10            MR. PERKINS:  Again, good afternoon, Your Honor.

11   Good afternoon to your staff.  May it please this Honorable

12   Court, my name is Todd Russell Perkins appearing on behalf of

13   Mr. Rashad.

14            THE COURT:  Good afternoon.

15            Are you Dwight Hassan Rashad?

16            THE DEFENDANT:  Yes, Your Honor.

17            THE COURT:  You have the right to remain silent.

18   Anything you say may be used against you.

19            This is the date and time for the detention hearing;

20   is that correct?

21            THE DEFENDANT:  Yes.

22            MS. SHAW:  That is correct.  I have a detention

23   motion worksheet for the Court, and also a set of photos that

24   I intend to use as exhibits.

25            THE COURT:  And have you shared those with
```

4

```
 1 ║ Mr. Perkins?

 2 ║         MS. SHAW:  Yes, I have.

 3 ║         THE COURT:  All right.

 4 ║         MR. PERKINS:  I haven't seen the motion or a sheet.

 5 ║         MS. SHAW:  No, it's just a worksheet.

 6 ║         MR. PERKINS:  Oh, okay.

 7 ║         THE COURT:  Yes, but you need to --

 8 ║         MS. SHAW:  Oh, I thought you --

 9 ║         THE COURT:  You need to share that with Mr. Perkins.

10 ║         MR. PERKINS:  Thank you.

11 ║         THE COURT:  Okay.

12 ║         MR. PERKINS:  I did have a -- I did have an

13 ║ opportunity to review the motion worksheet, Your Honor.  But

14 ║ Ms. Shaw did give me the other exhibits, I think, she's

15 ║ presented in the courtroom.

16 ║         THE COURT:  Yes.

17 ║         And Ms. Shaw, will you hand the exhibits to my case

18 ║ manager?  And I will try to remember, but also, Ms. Shaw,

19 ║ please remember to retrieve these from me --

20 ║         MS. SHAW:  I will.

21 ║         THE COURT:  -- after we're done.

22 ║         All right.  And Ms. Shaw, are you going by way of

23 ║ proffer?

24 ║         MS. SHAW:  I am.

25 ║         THE COURT:  I'm pretty sure that you both have had
```

1    detention hearings in front of me, so you know that I prefer

2    for you to start with your factual proffer, and then I'll hear

3    the argument.

4           You can go ahead, Ms. Shaw.

5           MS. SHAW:  Thank you, Your Honor.

6                         **GOVERNMENT'S PROFFER**

7           MS. SHAW:  The facts in this case are set forth in

8    the complaint that was issued last week, on Friday.  Mr. --

9           THE COURT:  And I -- I'll let you know that I did

10   review the complaint.

11          MS. SHAW:  Okay.  I have additional information to

12   supplement the facts in that complaint.

13          But they -- the gist of the charges are that earlier

14   this month, DA investigators received information that someone

15   later identified as Mr. Martinez, who was the initial

16   defendant in the case, Defendant Number One, will be doing a

17   money drop in connection with a drug transaction.

18          On November 21st, which was last week, on Thursday,

19   DA investigators observed Mr. Martinez and Defendant Number

20   Two, Mr. Rashad, book out of a residence that was under

21   surveillance on Marvin Gaye Drive in Detroit, carrying a bag.

22   They observed the two men depart the location in a black F150.

23          Further investigation has revealed that that black

24   F150 was not registered to either of the men, it was

25   registered to a woman named Melanie Wade, who was at the house

```
 1     later on in the evening.  And --
 2               THE COURT:  Can you tell me who was driving?
 3               MS. SHAW:  Mr. Rashad was driving.
 4               THE COURT:  Thank you.
 5               MS. SHAW:  Investigators observed them stop briefly
 6     at a liquor store, and then continue on in the F150.
 7               Michigan State Police initiated a traffic stop of the
 8     black F150, and each individual provided his respective
 9     driver's license.  Mr. Martinez's was from Arizona, and
10     Mr. Rashad's was from Michigan.
11               There was a K-9 Unit dispatched to sniff the car for
12     the odor of narcotics.  There was a positive indication of
13     narcotics on a bag that was in the back seat of the F150.  A
14     further search of that bag revealed several stacks of
15     currency.  The estimate that we have right now is about
16     $285,000.  And that bag is in exhibit -- in Government Exhibit
17     A, there is a photo of that bag.
18               Investigators obtained a state search warrant for the
19     residence at Marvin Gaye Drive where these two defendants
20     departed from earlier in the day.  They had done surveillance
21     at the Marvin Gaye Drive address also the night before, on
22     Wednesday, and Mr. Rashad was observed at that residence on
23     Wednesday, for several hours.  So he was there Wednesday for
24     several hours, and he was also there Thursday when he walked
25     out of the apartment unit.  I believe it's an apartment.  It
```

1    might be a condo, but I'm going to refer to it for purposes of

2    the hearing, as an apartment. -- walked out of the apartment

3    together and then headed to the F150.

4         The search of the Marvin Gaye Drive residence

5    resulted in the seizure of many kilograms of suspected

6    fentanyl and heroin.

7         They also identified --

8         THE COURT:  Are you -- you don't know, exactly --

9         MS. SHAW:  I do.

10        THE COURT:  -- how many?

11        MS. SHAW:  No, I do.  I don't have exact amounts

12   because we're still doing the testing, but I have approximate

13   amounts, and I can go through the photos and identify for the

14   Court.

15        THE COURT:  Okay.  Thank you.

16        MS. SHAW:  But they also, in addition to finding the

17   suspected narcotics, items utilized for drug processing, such

18   as face masks, gloves, scales, cutting agents, blenders, seal

19   bags, and importantly, Narcan, which is used to abort problems

20   if you have an opioid overdose.

21        Your Honor, drawing your attention to the photos that

22   I provided, Government Exhibit B is the rifle that was located

23   under a bed in that residence.

24        Government Exhibit C are two face masks that were

25   identify -- located in the residence.

1          Government Exhibit D are three tubs containing

2     powdery tan and powdery white substances.  The two that had

3     the white powder, one of them had approximately one kilogram,

4     the other had approximately 1.4 kilograms.  The total of all

5     of the suspected fentanyl, which is the white powder, which is

6     what we're counting as just fentanyl, is over 5 kilograms.

7          And then, there's a tub with some brown powder in it

8     with some tan and white.  We're considering that a mixture of

9     suspected fentanyl and heroin.  That tub had approximately 2

10    kilograms in it.  So in that package alone, in Government

11    Exhibit D, we've got approximately four and a half kilograms

12    of suspected fentanyl and heroin.

13         THE COURT:  I'm sorry, you said you had --

14         MS. SHAW:  There's --

15         THE COURT:  I thought you said over 5 kilograms of

16    fentanyl.

17         MS. SHAW:  There's additional fentanyl and heroin in

18    that house besides these three tubs.

19         THE COURT:  All right.  So can you just give me --

20    because -- what's in the tubs, the total amounts instead of

21    breaking it down?

22         MS. SHAW:  Yes, I can.

23         So the total amount, there were -- there was white

24    powder.  There was a tan and white powder together, which we

25    believe was heroin cut with fentanyl.

 1              THE COURT:  Right.  So how much --

 2              MS. SHAW:  Okay.

 3              THE COURT:  -- total fentanyl?

 4              MS. SHAW:  Total fentanyl, just suspected fentanyl is

 5    over five and a half kilograms.

 6              THE COURT:  In these tubs?

 7              MS. SHAW:  In these tubs and elsewhere that I'm --

 8    that are --

 9              THE COURT:  Okay.  So in the house in general?

10              MS. SHAW:  Yes.

11              THE COURT:  Okay.

12              MS. SHAW:  So there was approximately five and half

13    in these tubs, and another five elsewhere in the house.

14    There's also a tan and white mixture of approximately five and

15    a half kilograms.  And there was another amount of tan powder,

16    which is suspected heroin, that may or may not be cut that was

17    approximately 600 grams.

18              And then, there were also blue pills that agents

19    believed based on their training and experience, are pressed

20    fentanyl pills, and there were 685 grams of those pills.

21              Government's Exhibit E and F are going to be items

22    that the Court is familiar with, just general processing

23    materials, packaging, and distribution of controlled

24    substances.

25              Government Exhibit G is a package of Narcan.

```
 1            Government Exhibit H is a cooler that contained
 2   suspected fentanyl that was located in the apartment.
 3            And then Government Exhibit I is a -- I call them
 4   rough totes.  They're basically storage bins.  And this
 5   storage bin contained face masks and other types of drug
 6   processing materials.  It's significant because when agents
 7   opened this bin, they shortly after, displayed symptoms
 8   typical of exposure to fentanyl.  So the residents had to be
 9   evacuated and team members had to put on protective gear to
10   continue the investigation of the property.
11            THE COURT:  They opened the bin and --
12            MS. SHAW:  They started to have the --
13            THE COURT:  -- they started feeling --
14            MS. SHAW:  -- symptoms of fentanyl exposure, so they
15   had to evacuate and then put on protective gear which included
16   body suits and masks and double protection gloves and things
17   of that nature.  So it was a very toxic environment in the
18   house.
19            And then finally, Government Exhibit J, to the
20   Court's earlier question was, all the drugs that were found in
21   the house, there was also marijuana.  There was the three
22   bins, two in the front and one in the back at the top, and
23   then several other packages of suspected controlled
24   substances.  So we just did some quick math here this morning,
25   given that the case just came in on Friday, and it looks like
```

```
 1    it's over 11 kilograms of suspected fentanyl and heroin.
 2           In terms of additional facts about the event, I've
 3    already mentioned that the car he was driving was registered
 4    to a woman who was present at the house just before the search
 5    warrant was executed, and she attempted to leave and was
 6    stopped by police.
 7           I also would like to proffer the criminal history
 8    that is listed in the pretrial services report.  I understand
 9    that Pretrial Services is recommending bond, but I think that
10    the facts of his prior criminal record are significant here.
11    He's got a conviction for murder.
12           THE COURT:  Can you --
13           MS. SHAW:  He's got some --
14           THE COURT:  Can you direct me to where you're
15    looking?
16           MS. SHAW:  Yes.  I'm looking at page 3, and over to
17    page 4 of the pretrial services report.
18           THE COURT:  Okay.  You can go ahead.
19           MS. SHAW:  Then, after that, he has two more
20    convictions for stolen property and larceny, and a drug
21    conviction for heroin, subject -- the substance at issue in
22    our case.  After that, another fraud, you know, theft by
23    deception after that.  More fraud.  And then subsequently,
24    another controlled substance offense.  Carrying a concealed
25    weapon in a motor vehicle after that.  And then, on pages 5 to
```

1    6, there are two more controlled substance convictions.  The

2    case numbers are different, so I believe they're different

3    cases.  But in any event, each involves 1,000 or more grams.

4    The first case involves narcotics or cocaine, and the second

5    case involves narcotics, heroin, or cocaine, where the

6    defendant was apparently sentenced to life in prison, and then

7    was re-sentenced on appeal, and the case was closed.

8           The information I received from the pretrial services

9    officer was that he was released on parole in 2010, and then

10   his parole was closed in 2014.

11          Those were the facts that the United States is

12   relying on in favor of detention.

13          THE COURT:  All right.  Thank you.

14          Mr. Perkins.

15                       **DEFENDANT'S PROFFER**

16          MR. PERKINS:  May I -- may it please the Court.

17   The Court indicated, and I know every judge is different, you

18   -- may I respond just fluently as she -- well, I'll start off

19   with the factual proffer.

20          THE COURT:  Yeah, I'd like your factual proffer.

21   I'll have your -- I'll give you full opportunity for argument,

22   but for right now, --

23          MR. PERKINS:  Okay.

24          THE COURT:  -- is there any facts that you'd like to

25   point out?

```
 1              MR PERKINS:  Well, for one, even in the complaint
 2     itself -- I'm sorry, I muted this.  I'm sorry.
 3              In the complaint itself, there's no suggestion that
 4     there's any connection or any ownership or possessory or any
 5     dominion of control of Mr. Rashad as it relates to this
 6     residence.  In fact, it appears in that particular complaint,
 7     it indicates that based upon neighbors or some investigation
 8     that investigators took in this matter, it was the
 9     co-defendant who was associated with that particular
10     residence.  I understand what the Government is saying as far
11     as having seen Mr. Rashad there the day before, and I believe
12     it would be for a brief period on the Thursday, the date of
13     this particular arrest.
14              So there is a lack of connection with Mr. Rashad as
15     it relate to that residence, we believe.  Furthermore, you
16     know, and -- and it sounds to me, because when we're dealing
17     with the complaint stage, we have so little information, the
18     case is so new, but as the Government indicated, it said it
19     was a traffic stop, but it didn't indicate or suggest that
20     there was an infraction that precipitated the stop.  So
21     without any other basis, and without any other information,
22     one might conclude one could argue, even from a factual
23     perspective, that if that stop violated his constitutional
24     rights at that point, then thereafter --
25              THE COURT:  Mr. --
```

```
 1              MR. PERKINS:  And I recognize that's an issue for the
 2    judge who's going to have the --
 3              THE COURT:  And I just want to be real clear about
 4    that --
 5              MR. PERKINS:  Yes.
 6              THE COURT:  -- because I can't envision scenarios
 7    where there was probable cause, even if there were no traffic
 8    violations.  But I just have no authority to consider --
 9              MR. PERKINS:  Okay.
10              THE COURT:  -- whether there was a Fourth Amendment
11    violation.
12              MR. PERKINS:  Understood.
13              But I think -- I was just making mention of it.  I
14    would be remiss if my client came to me and said why wouldn't
15    you say that.  So I'll move on.
16              THE COURT:  I'm not faulting you for it.
17              MR. PERKINS:  Okay.
18              THE COURT:  But I just want it to be clear --
19              MR. PERKINS:  Okay.
20              THE COURT:  -- to Mr. Rashad, in particular, that he
21    will preserve any rights he has to request that evidence be
22    suppressed.  But that's -- this is just not the forum for
23    that.
24              MR. PERKINS:  Okay.
25              Furthermore, even from the suggestion or the
```

1    proffered information from the Government, it -- it's not

2    information that describes or details Mr. Rashan that led them

3    to this investigation.  That being the case, I believe that

4    there is a -- without any further information, even from the

5    proffer, there's a stretch to place Mr. Rashad in harm's way

6    of the contraband that's alleged to have been retrieved from

7    that particular residence.

8              As it relates to -- oh, factually, the factual

9    proffers as it relates to his prior criminal history, one, if

10   the Court would direct -- I would ask the Court if the Court

11   could review page 3 of the pretrial services report, my client

12   -- I had an opportunity to write this information down earlier

13   and visit Mr. Rashad earlier, to ask him about that

14   information.  It's clear, if he were convicted in 1972, of

15   murder, and is convicted and sentenced to 21 years, he very

16   well could not have been in Detroit in 1974 and been convicted

17   and getting probation and six months of incarceration.

18             My client relates to the Court that case was

19   dismissed.  He was 15 years old at the time.  I know it says

20   16 years old here.  Perhaps, a memory gap.  But one thing's

21   for certain, these things could not have happened.  He's

22   indicated that that is a -- that is an error.  He was not

23   convicted of murder.  I think it suggests clearly from the

24   fact that inasmuch as it puts us in the cross hairs for the

25   Court to see him committing crime -- committing crime in the

1   community in Detroit where he moved to, his family moved to.

2   But again, I would submit to the Court to not consider that

3   particular information of a conviction and being sentenced to

4   21 years in that matter.

5           As it relates to the -- and, yes, in 1980, there was

6   an attempt heroin possession.  But also, in the Court -- the

7   Government proffered the number of theft counts in 1981, which

8   was actually reduced to a misdemeanor.

9           Now, going forward as it relates to the -- I believe

10  what's very important for the Court to consider is the 1988.

11  It appears to be two separate convictions.  But what my client

12  did indicate is that although resentenced, one of those cases

13  through the Federal Court process and Federal Court appellate

14  process, was ultimately reversed and dismissed.  He indicated

15  that it was a double jeopardy matter.  I have not had

16  information to -- even looking on Pacer, the cases are too old

17  to even review on caser -- Pacer at this point.

18          But I would indicate that in this report, it suggests

19  that on 1/12/2014, that one case was --

20          THE COURT:  2004?

21          MR. PERKINS:  No, on the -- on page 5, it was the

22  1/12/2014, --

23          THE COURT:  Oh, I see that.  Okay.

24          MR. PERKINS:  -- the parole was closed on that case.

25  But as you can see, on the other case, on page 6, that case

1    was resentenced on appeal, and the case was closed.

2         So it does support all the information that

3    Mr. Rashad has provided to me in a very limited of time that

4    we've had to discuss this.  It does support his position as it

5    relates to what transpired in those cases.

6         But again, what I would seek to offer to the Court is

7    that you have a man here who is 63 years old, the only care

8    provider for his 87- and 88-year-old parents, one parent

9    residing with him.  He is gainfully employed.

10        He has -- he has family who are in the courtroom.  I

11   know at least one daughter I saw was in the courtroom, maybe

12   two.  But he has a fiancée who's indicated that she would even

13   be willing to be a third-party custodian.

14        I think that you have all the underpinnings to

15   reconcile the concerns a Court would typically have in a

16   situation like this, where you have a -- you have, not only

17   the great weight of the Federal Government to monitor him, but

18   again, you have his connection to the area, you have a means

19   by which he can be tethered and only allowed to go to work.

20   He has all those individuals and all of the players that would

21   be necessary to be questioned, queried, and to quail the

22   concerns that you have in granting bond.

23        Furthermore, --

24        THE COURT:  May I ask you some questions about that

25   --

1    MR. PERKINS:  Yes.

2    THE COURT:  -- Mr. Perkins?

3    MR. PERKINS:  Yes, please.

4    THE COURT:  You said he's gainfully employed.  You

5  could he could be tethered.  He has separate homes; is that

6  correct?  That he's --

7    MR. PERKINS:  No, he has group -- group homes.

8    THE COURT:  That's what I mean.

9    MR. PERKINS:  Yes.  Yes.

10    He resides in one.

11    THE COURT:  Okay.  So my question is, if I were to

12  release him and give him a curfew, what impact would that have

13  on the group homes that he doesn't live in?  Are there other

14  people in those group homes?

15    MR. PERKINS:  Well, his fiancée works in the Probate

16  Court system doing guardianships and things of that nature.

17    THE COURT:  I'm not talking about the guardianship,

18  I'm talking about the care for the residents in the group

19  homes.

20    MR. PERKINS:  Okay.  Yes, there are people that would

21  be able to assist him.  If you told him he has to be home at

22  8:00, and you get a call that some 76-year-old individual fell

23  in the middle of the night, he does have individuals that he

24  can direct to go to those residents.

25    THE COURT:  Okay.  That was my question.

 1          MR. PERKINS:  Okay.  Sorry.

 2          But again, I believe that there are a host of

 3     different reasons, more reasons to grant him a bond than to

 4     deny him, Your Honor.

 5          And more importantly, you have the -- the Pretrial

 6     Services Department who, I believe, we rely upon, we trust to

 7     make recommendations, and it's only recommendations.  Your

 8     Honor is the one who's going to make the decision.  But I just

 9     don't see it as -- and I'm not minimizing, I'm --

10          THE COURT:  It sounds like you're arguing.

11          MR. PERKINS:  Oh, I'll stop.  I'll stop.

12          THE COURT:  Thank you.

13          Ms. Shaw.

14          MS. SHAW:  Thank you.

15          May I proceed with argument?

16          THE COURT:  Yes.  Thank you.

17                      **GOVERNMENT'S ARGUMENT**

18          MS. SHAW:  First, I'd like to address a few of the

19     points Mr. Perkins made about criminal history.  I'm looking

20     at the criminal history right here.  It says charge, literal

21     murder, and disposition, conviction.

22          I appreciate Mr. Perkins' point that his client

23     appears to have been convicted of other crimes in short order

24     after that conviction, and perhaps he was released early, but

25     there's no question from this criminal history report that he

1     was convicted of murder, so --

2          THE COURT:  I -- I don't think that this order,

3     itself, is proof of the information.  There are times where

4     the information, especially of that age, is imprecise.  So I

5     just want it to be clear that even though we rely upon these

6     reports, it does -- there does seem to be an inconsistency

7     between the sentence of 21 years and the arrest, so...

8          MS. SHAW:  Right.  Well, it may very well be -- it

9     may well be that he was charged as a minor.

10         THE COURT:  Do you have records beyond the -- beyond

11    the pretrial services report?

12         MS. SHAW:  I just have a criminal history that was

13    run by my one part -- or team, which I believe is the same

14    report that Pretrial Services receives.

15         THE COURT:  Okay.  Go ahead.

16         MS. SHAW:  And then, there were the other two

17    convictions from 1988.  And I do think that report is quite

18    clear that there was some resentencing.  It doesn't show that

19    these convictions were dismissed.  One was resentenced, and

20    then he was granted parole.  And that parole was closed, so he

21    was, you know, given release.  And the other, it just says

22    that he was resentenced, and the case was closed.  But that

23    doesn't suggest that the underlying charges were dismissed or

24    that he didn't commit the crimes at issue.  It's a sentencing

25    issue.

1          Mr. Perkins has made a few points this afternoon,
2    that it's early in the case.  And I agree with him very much
3    in that regard.  And that's why we have a presumption in
4    certain cases for detention.  This is a case involving a
5    significant amount of poisonous fentanyl and poisonous heroin,
6    over -- well over 10 kilograms, I believe, over 11 kilograms.
7          This case has not been fully investigated.  We just
8    got it.  It came onto my desk Friday morning at about 10:30,
9    and we're working on it, you know, with all deliberate speed,
10   but what we know at this point is there was a massive amount
11   of heroin and fentanyl, and that this defendant was leaving
12   that house with a bag in his car of over $285,000 in cash.
13         Congress has set a presumption in these types of
14   cases for a reason, so that they can be fully investigated.
15         I think there's an implicit suggestion that
16   Mr. Rashad has been living a clean life since he got out of
17   prison in 2014, and I've got concerns about that as well.
18   Because this is clearly a house where drugs are being
19   processed for additional packaging and sale.
20         What was he doing there?  Why was he there on
21   Wednesday night for several hours?  Why was he there on
22   Thursday?  Why was he driving Mr. Martinez around with a bag
23   of cash?  He certainly wasn't doing group care for elderly
24   senior citizens on Wednesday night or Thursday evening when he
25   was driving around with Mr. Martinez.

DETENTION HEARING - November 25, 2019

```
 1          We don't have the report for Mr. Martinez yet, but my
 2   understanding is he's from Arizona.  I don't know how
 3   Mr. Rashad would have a relationship with this man from
 4   Arizona.  It's not clear to us at all.
 5          THE COURT:  Can I ask you a question?
 6          MS. SHAW:  Yes.
 7          THE COURT:  In paragraph five of the complaint, it
 8   says that investigators observed Martinez and Rashad walk out
 9   of a residence carrying a bag.
10          Are you able to specify which of them was carrying
11   the bag?
12          MS. SHAW:  Yes.  Martinez was carrying the bag.
13          THE COURT:  All right.  Thank you.
14          MS. SHAW:  Something else that's important to the
15   United States is that he was driving someone else's truck.
16   And that's another fact that we see often in cases where
17   people are involved in transporting drug proceeds or
18   narcotics, is that they don't drive their own car, they drive
19   someone else's car.  In this case, there's no question that he
20   was driving a car that belonged to someone else.  And he was
21   there the day before, in even a different car.  So this is
22   someone who's come to this house twice in 24 hours, in two
23   different vehicles.
24          The amount of heroin and fentanyl in this house is
25   just astronomical.  I've already pointed out his prior
```

1    criminal record that is notwithstanding that some of the

2    convictions are old, it's still quite alarming to the United

3    States.

4            I'm concerned about the type of business that he's

5    in, which is care for the elderly, if he's involved, even at

6    the probable cause level, of being involved with heroin and

7    fentanyl.  The type of care that would be provided to these

8    vulnerable people is very concerning to us.  And there is even

9    a possibility that he is exploiting the elderly to get access

10   to their medicine, given his criminal record for controlled

11   substance offenses.

12           So the United States is of the opinion that there are

13   no reasonable conditions that can guarantee this defendant's

14   appearance or safety of the community.

15           He is facing, if the convictions hold, a 25-year

16   mandatory sentence given the amount of drugs and a prior --

17   prior convictions for the controlled substances, and a serious

18   violent felony of similar convictions.  And that's a very

19   significant penalty which might insight someone to fail to

20   appear for court.

21           THE COURT:  Yes.

22           Are you --

23           MS. SHAW:  I'm finished.

24           THE COURT:  Let me make sure.

25           Okay.  Thank you.

```
 1              MS. SHAW:  Thank you.

 2                    DEFENDANT'S ARGUMENT

 3              MR. PERKINS:  Ms. Shaw said a lot, so I'll start

 4     where she left off.

 5              One, the issue -- let's talk about the issue of the

 6     murder.  Which, I don't believe -- I would argue that it

 7     doesn't -- it's not supported by the information that the

 8     Court has or that the Government has presented.

 9              But more importantly, as our guidelines work, what he

10     did as a juvenile, that doesn't apply to his adult sentences.

11     And given the age of that, that would be far -- far way

12     outside, even if you were assessing it for the purposes of how

13     Ms. Shaw talked about the 25-year mandatory penalty.

14     Notwithstanding, we're still dealing with a very serious

15     situation.  But again, it -- the fact that Ms. Shaw does not

16     have questions to the things that she's laid at the feet of

17     the Court would support the fact that it's tangential at best,

18     with how Mr. Rashad finds himself here.

19              He's not the one, per her indication, who's holding

20     the bag.  He's not the one who is connected by way of this

21     information that's listed in the complaint.  I know that she's

22     indicated that pursuant to some surveillance, some physical

23     surveillance, that he was at the residence.  But there's no

24     answers to those questions.  There's nothing to suggest

25     anything.
```

```
 1              And by the very fact that it is so early in the case
 2    that she -- as she's indicated, there's not enough -- I would
 3    argue, if we were here for the purpose of a preliminary
 4    examination, there's not enough to charge him now for probable
 5    cause.  But we're not here for that today.
 6              And I know she would be in a better situation to
 7    argue her case, but given what we have, an individual who, you
 8    know -- and what is bothersome, you know, hurtful to the
 9    process, is the illusory statements to suggest that there's
10    anything that he's done wrong with the people -- the older
11    people that he serves.  It just seems that we're trying to
12    paint a broad brush based upon what is found here, when
13    there's absolutely nothing to support that his business in
14    caring for the elderly and managing these, I don't know,
15    senior homes or adult foster care or senior home facilities,
16    that there's any malfeasance or misconduct on behalf of
17    Mr. Rashad in those places.  So to suggest that without that
18    information, sometimes, you might even call it reckless.
19              But again, we're not here to go back and forth in
20    that way.  I just believe that based upon the investigation
21    that Pretrial Services has thoroughly done, based upon the
22    information that you have before you today, I believe that
23    that is an individual that is deserving of a bond, to show the
24    Court -- and the Court even said there is a multitude of
25    different provisions that the Court can set to ensure that you
```

1    won't be worried about the whereabouts of Mr. Rashad.

2            So I -- I'm asking the Court, you know, with the --

3    with the conditions that are stated, to apply the conditions

4    that are stated by the Pretrial Services, and to surrender his

5    passport and all of the other conditions that are listed in

6    there.  I do believe that they've done a thorough job.  And I

7    would not -- in this case, I don't think there's any reason

8    the Court should have not to find that this is a reasonable

9    decision to make at this point, given the lack of information

10   and the lack of connectivity of Mr. Rashad to these offenses.

11           Thank you.

12           THE COURT:  All right.  Any quick rebuttal, Ms. Shaw?

13           MS. SHAW:  No, thank you.

14           THE COURT:  All right.  Thank you.

15           Mr. Rashad is presumed innocent.  He is presumed,

16   however, to be a flight risk and a danger to the community

17   upon a finding of probable cause, that he participated in a

18   conspiracy to distribute drugs.  And the Court does find that

19   there is probable cause that he participated in the

20   conspiracy, but there's not much more than probable cause that

21   he was a participant in -- at some level.  And the evidence

22   doesn't bear out exactly what that -- his role would be.

23           It's true that there's a massive amount of drugs that

24   are -- that were found in the home.  And I am always alarmed

25   at the distribution of heroin to our community because

1    everybody who is distributing heroin at this point knows that

2    it kills people.  That would be the reason why there -- Narcan

3    would be in the house, is because of the -- the knowledge that

4    -- of how deadly it is.

5              The Government raises a lot of questions and says

6    that the presumption is in place so that the Government can

7    further investigate it.  I don't think that that's either the

8    reason for the presumption, or the role of a prosecution, is

9    not to allow the Government to investigate.

10             I have to consider the evidence and not the

11   speculation that is presented to the Court.  And I will say,

12   even when the presumption applies, the burden of persuasion

13   always rests with the Government.

14             And so, I consider the nature and circumstances of

15   the charge.  And the nature and the circumstances, as I said,

16   it's a very serious crime.  And then, I am to consider the

17   weight of the evidence against the person.  And that's as to

18   dangerousness of further activity, illegal activity, or risk

19   of non-appearance.

20             In this case, the risk of dangerousness is tied to

21   Mr. Rashad's role.  I don't know whether he was a friend of

22   Mr. Martinez's who was just driving the car for him.  The --

23   as Mr. Perkins pointed out, the investigation -- or the

24   complaint suggested that the investigation was really directed

25   at Mr. Martinez.  He was the one who the Government had

1   received information about before the investigation began.  He

2   was also the one carrying the bag, even though that -- that

3   was not specified in the complaint.  The complaint

4   specifically says previous physical surveillance, electronic

5   surveillance, and a statement given by one of Martinez's

6   neighbors associated Martinez with the residence.

7           There's no similar statement about Mr. Rashad.  So if

8   he were -- if Mr. Rashad were only a driver or played a very

9   minor role, then there isn't strong evidence about his

10  dangerousness.  And I just don't have anything before me to --

11  to make that calculation.

12          The history and characteristics of the person,

13  including the family ties, it does appear -- I don't see any

14  evidence that Mr. Rashad has strong ties anywhere outside of

15  the Eastern District of Michigan.  He does have ties to this

16  district.  The length of residence in the community is, I

17  think, 45 years.

18          And then, I have to look at his criminal history.

19  And the criminal history goes back more than 30 years.  I

20  really couldn't give much weight, even if Mr. Rashad were

21  convicted of -- of murder at 15 or 16 years old.  I don't

22  think it says a lot about Mr. Rashad as a 63-year-old man.  I

23  know I don't want anyone to look at my misbehavior -- not that

24  I was involved in anything like murder at 15 and 16 -- and

25  draw any conclusions about me now, unless there were

1    continuous similar activity, more recent than more than 30

2    years ago.  And I don't see that.

3            And Mr. Rashad wasn't under any form of supervision.

4    As I said, his criminal history is quite old.

5            I do believe that because of the massive amount of

6    drugs involved in this case, that -- and the probable cause,

7    even though as I said, it's only that Mr. Rashad played some

8    part in the conspiracy, I do want Mr. Rashad to be under a

9    location monitoring program with a curfew, within the

10   discretion of the pretrial services officer.

11           I'm not going to appoint a third-party custodian.  I

12   don't think that anyone should be a third-party custodian to a

13   63-year-old man.  I don't think that he's likely to be well

14   supervised by someone that is not a member of law enforcement,

15   at his age.

16           And I do want Mr. Rashad to have a curfew.  And he

17   will have to reside at the residence that he gives to Pretrial

18   Services, and not move without prior permission.  I do want us

19   to be able to follow what he is doing.

20           Ms. Shaw, in addition to the location monitoring and

21   the conditions recommended by Pretrial Services, are there any

22   other conditions that you request?

23           MS. SHAW:  No, thank you.

24           THE COURT:  Mr. Shaw, do you have -- I'm sorry.

25           Mr. Perkins, do you have any objections to any of the

```
 1   conditions that I've indicated that I will follow?
 2            MR. PERKINS:  I do not, Your Honor.
 3            THE COURT:  All right.  Thank you.
 4            Mr. Rashad, I'm going to place you on a $10,000
 5   unsecured bond with the following conditions:
 6            You are -- first, you are to report as directed to
 7   Pretrial Services.
 8            Do you understand that?
 9            THE DEFENDANT:  Yes, ma'am.
10            THE COURT:  You must surrender your passport to
11   Pretrial Services by November 26th -- so I believe that's,
12   tomorrow -- at 4:00 p.m.
13            Do you understand that?
14            THE DEFENDANT:  Yes, ma'am.
15            THE COURT:  You may not obtain any -- a passport or
16   any other international travel document.
17            Do you understand that?
18            THE DEFENDANT:  Yes, ma'am.
19            THE COURT:  Mr. Rashad, do you understand that -- or
20   do you have a driver's license?
21            THE DEFENDANT:  Yes, I do.  Yes, I do.
22            THE COURT:  Is it a regular driver's license, or an
23   enhanced driver's license?
24            THE DEFENDANT:  Regular driver's license.
25            THE COURT:  Okay.
```

1      I want to restrict Mr. Shaw -- I'm sorry, I keep on

2  mixing it up.  -- Mr. Rashad's travel to the Eastern District

3  of Michigan without permission of Pretrial Services.

4      Do you understand that, Mr. Rashad?

5      THE DEFENDANT:  Yep.  Yes, ma'am.

6      THE COURT:  You'll receive a map from Pretrial

7  Services that will show you the boundaries of the Eastern

8  District of Michigan, and you should look at that before you

9  travel outside of your community so that you don't

10  accidentally violate that condition.

11      Do you understand that?

12      THE DEFENDANT:  Yes, ma'am.

13      THE COURT:  You must avoid all contact, directly or

14  indirectly, with any person who is or may become a victim or

15  witness in the investigation or prosecution.  And, that

16  includes any co-defendants.

17      Do you understand that?

18      THE DEFENDANT:  Yes, ma'am.

19      THE COURT:  When I say no contact, and it says direct

20  or indirect, I mean no text messages, no e-mails, no phone

21  calls, no sending a message through a friend.  There should be

22  no effort to communicate with any victims, witnesses, or

23  co-defendants.

24      Do you understand that?

25      THE DEFENDANT:  Yes, ma'am.

```
 1              THE COURT:  You may not possess a firearm,
 2     destructive device, or other dangerous weapon.
 3              Do you understand that?
 4              THE DEFENDANT:  Yes, ma'am.
 5              THE COURT:  You may not possess or use any narcotic
 6     drugs that are not prescribed by a licensed medical
 7     practitioner.
 8              Do you understand that?
 9              THE DEFENDANT:  Yes, ma'am.
10              THE COURT:  And you understand you can't smoke
11     marijuana regardless of any -- or you can't use any marijuana
12     at all, regardless of state laws allowing for marijuana use?
13              THE DEFENDANT:  Yes, ma'am.
14              THE COURT:  You must submit to drug testing as
15     directed by Pretrial Services.
16              Do you understand that?
17              THE DEFENDANT:  Yes, ma'am.
18              THE COURT:  You must participate in drug treatment as
19     directed by Pretrial Services.
20              Do you understand that?
21              THE DEFENDANT:  Yes, ma'am.
22              THE COURT:  You will be on a program, a location
23     monitoring program, some sort of tether, with a curfew, as
24     directed by Pretrial Services.
25              Do you understand that?
```

```
 1              THE DEFENDANT:  Yes, ma'am.

 2              THE COURT:  Pretrial services will assess your

 3    ability to pay all or part of the cost of the location

 4    monitoring program.  And it is a condition of your bond that

 5    you pay whatever Pretrial Services says that you need to pay.

 6              Do you understand that?

 7              THE DEFENDANT:  Yes, ma'am.

 8              THE COURT:  If you fail to appear as directed, that's

 9    a crime punishable with a sentence of imprisonment.

10              Do you understand that?

11              THE DEFENDANT:  Yes, ma'am.

12              THE COURT:  If you violate any of the conditions of

13    your bond, you could be jailed pending trial or sentencing.

14              Do you understand that?

15              THE DEFENDANT:  Yes, ma'am.

16              THE COURT:  If you commit any new crimes while you're

17    on pretrial release, the sentences that you would face for

18    those new crimes would likely be higher than if you committed

19    the same crimes otherwise.

20              Do you understand that?

21              THE DEFENDANT:  Yes, ma'am.

22              THE COURT:  And I should mention, as you know and as

23    you've heard, Mr. Rashad, there is a presumption that you

24    should be detained pending your trial or sentencing.  So if

25    you do anything that violates your bond, you are very likely
```

1    to be detained pending trial or sentencing.

2            Do you understand that you're -- you're on a short

3    leash?

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  Okay.  Because I have given Mr. Rashad a

6    bond, his preliminary hearing will be scheduled for December

7    6th, I believe.  I'm sorry, December 13th.

8            Is that correct, Ms. Williams?

9            CASE MANAGER:  Yes, December 13th at 1:00 p.m.

10     (The proceeding was adjourned at 2:20 p.m.)

11                        *     *     *

12               C E R T I F I C A T E

13     I certify that the foregoing is a correct transcription of

14   the record of proceedings in the above-entitled matter.

15

16   S/ Shacara V. Mapp                      03/27/2024

17   Shacara V. Mapp,                        Date

18   CSR-9305, RMR, FCRR, CRR

19   Official Court Reporter

20

21

22

23

24

25